USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 ____________________

No. 97-1486

 UNITED STATES,

 Appellee,

 v.

 JOHN A. MARQUARDO,

 Defendant, Appellant.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Robert E. Keeton, U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,

 Boudin and Lynch, Circuit Judges.

 _____________________

 Henry D. Katz for appellant.
 Fred M. Wyshak, Jr., Assistant United States Attorney, with
whom Donald K. Stern, United States Attorney, and Andrea N. Ward,
Assistant United States Attorney, were on brief for appellee.

 ____________________

 July 17, 1998
 ____________________ TORRUELLA, Circuit Judge. Among other matters, this
appeal raises issues that require us to focus on the diverse nature
of civil as compared to criminal contempt, and on the consequence
of such differences in the context of allegations of due process
and double jeopardy violations. Appellant also challenges the 
validity of the criminal contempt statute, 18 U.S.C. 401(3),
alleging that it is unconstitutionally vague, claims that his
motion for acquittal was improperly denied by the trial judge in
that the government failed to prove his willfulness to commit the
charged crime beyond a reasonable doubt, and lastly, contends that
he was improperly sentenced under the obstruction of justice
guideline, 2J1.2, rather than the purportedly more analogous
 2J1.5, which deals with failures to appear by a material witness.
We consider these issues seriatim, and ultimately conclude that the
rulings of the district court should be affirmed in all respects.
 I. Relevant Background
 In April 1993, appellant was subpoenaed to testify before
a grand jury convened in the United States District Court for the
District of Massachusetts. On this occasion appellant declined to
testify, invoking his Fifth Amendment privilege against self-
incrimination. Thereafter, the Government moved the district court
for an order pursuant to 18 U.S.C. 6002 et seq., granting
appellant immunity and compelling his testimony. This motion was
granted, and an order issued to that effect on May 7, 1993.
 On May 20, 1993, appellant was again summoned before the
grand jury and a copy of the May 7th order was served upon him and
his attorney. Nevertheless, appellant refused to comply with the
order and to give evidence before the grand jury. On that same
day, shortly after his refusal, a hearing was conducted before the
district judge, at which time appellant again reiterated his
refusal to comply with the May 7th order and to testify before the
grand jury. He was thereafter adjudged in civil contempt by the
district judge and pursuant to the civil contempt statute, 28
U.S.C. 1826, was committed to federal custody until such time as
he obeyed the May 7th order, or until the expiration of the grand
jury, whichever event occurred first. The order granted appellant
two weeks within which to report to the U.S. Marshal to start his
confinement, and thus he actually commenced his detention on
June 4, 1993.
 As things would have it, the grand jury's commission
expired on September 12, 1994, without the benefit of appellant's
testimony. Appellant thus remained in custody without purging his
contempt from June 4, 1993, to September 11, 1994, when he was
released from civil incarceration. Approximately two years later,
however, on May 7, 1996, another grand jury returned an indictment
against appellant charging him with criminal contempt, for his
failure to comply with the May 7, 1993 order in violation of 18
U.S.C. 401(3).
 Appellant moved to dismiss the indictment, alleging that
his prosecution was barred on double jeopardy, vagueness, and fair
warning/due process grounds. These contentions were rejected by
the district court. After a brief bench trial appellant was
convicted on December 18, 1996, and thereafter was sentenced to
fifteen months' imprisonment on March 25, 1997. This appeal
followed.
 II. Double Jeopardy
 The Double Jeopardy Clause of the Fifth Amendment of the
Constitution of the United States provides that no person "shall be
subject for the same offense to be twice put in jeopardy of life or
limb." U.S. Const. amend. V (emphasis supplied). This provision
protects persons against multiple prosecutions or punishments for
the same offense. See United States v. Dixon, 509 U.S. 688, 696
(1993).
 In a nutshell, appellant argues that because he was 
"punished" by 17 months' incarceration pursuant to the civil
contempt order issued May 20, 1993, he cannot be also punished
criminally for the same offense. See United States v. Ursery, 518
U.S. 267, 273 (1996). This is an allegation that clearly
misconstrues the distinction between civil and criminal contempt,
as well as fails to take into account longstanding unmodified
precedent that exists in this area of the law. See, e.g.,
Shillitani v. United States, 384 U.S. 364, 368 (1966); Yates v.
United States, 355 U.S. 66, 74 (1957); United States v.
Nightingale, 703 F.2d 17, 19 (1st Cir. 1983). Appellant was
neither "punished" for his civil contempt, nor prosecuted for the
"same offense" when he was later charged and convicted for criminal
contempt, notwithstanding that both contempts arose out of the same
operative facts. This conclusion becomes clearly apparent when one
considers the nature and purpose of civil versus criminal contempt,
as well as the consequences that flow from a judicial finding in
each case.
 The purpose of civil contempt is to coerce compliancewith an order of the court. See G. & C. Merriam Co. v. Webster
Dictionary Co., 639 F.2d 29, 40 (1st Cir. 1980). The subjects of
the court's order have "the keys [to their] prison in their own
pockets." Shillitani, 384 U.S. at 368. They can be incarcerated
for no time, if there is compliance before custody commences; for
some time, if there is submission to the order after incarceration
begins; or for as long a time as the grand jury is extant, if there
is unrepented contumacy. In any event, it is totally clear that
incarceration for civil contempt is not for the purpose of
punishing recalcitrant respondents but rather is the modern
"persuasive" tool that is used in substitution of the barbaric
placing of stones on the subject's chest, which was formerly used
to literally press the recipient into submission. See J. Langbein,
Torture and the Law of Proof 74-76 (1977); see also L. Levy, The
Origins of the Fifth Amendment 276-277 (1968). Incarceration for
civil contempt only seeks acquiescence to a court's order, not
retribution for noncompliance with its command.
 Criminal contempt, on the other hand, is used to punish 
disobedience with a judicial order, and thus vindicates the
authority of the court. G. & C. Merriam Co., 639 F.2d at 40. This
crime is completed when contumacious conduct has taken place,
regardless of whether the subject later complies with the order he
or she had earlier violated. That is, once the subject of an order
willfully refuses to meet the court's order, criminal contempt has
been committed independently of whether this conduct receives the
additional attention of the court by the issuance of a civil
commitment order seeking compliance. For example, in its May 20,
1993 order, the district judge in this case found appellant in
"willful failure to obey the Order" of May 7, 1993, and directed
his commitment to the custody of the Marshal until such time as he
complied, or the grand jury's term expired, which ever occurred
first. The district judge granted appellant two weeks to report to
begin his incarceration. Had he complied with this order before he
reported to the Marshal, the civil commitment would have become
automatically ineffective, yet he would still have been subject to
a criminal contempt charge because that offense was consummated
once he willfully failed to comply with the May 7th order.
 The distinction between civil and criminal contempt is
not limited to the difference in the purposes served by each, the
first being remedial, the second being punitive. Clearly, this
differentiation emphasizes the crucial condition that only criminal
contempt is an "offense," which is the relevant language used by
the Double Jeopardy Clause. However, there are also variances in
the technique and scope within which they traditionally operate.
 Although in the present appeal both the civil and
criminal contempts arise within the context of criminal matters,
this is neither a sine qua non nor probably its most common
setting. A frequent scenario for civil contempt situations arises
as a result of the exercise of the courts' equity jurisdiction, in
which the coercive tool is often periodic (daily, weekly, etc.)
monetary fines, tailored to compensate the party aggrieved for the
damages suffered as a result of the contumacious conduct of the
noncomplying party. See United States v. Bagwell, 512 U.S. 821
(1994). The payment of such civil fines by one party to another,
a common technique used by courts not only to force obedience, but
also to remedy the harm caused, emphasizes another basic
distinction between civil and criminal contempt. In the latter,
what is sought, as in the case of all criminal charges, is the
vindication of public rights. Thus, if criminal fines are imposed
in addition to or in substitution for incarceration, they cannot be
used for the purpose of compensating an aggrieved party. They are
directed towards punishing the crime that has already been
committed, and to act as a deterrent against future violations. 
Because these criminal monetary penalties are not related to
compensation, but are instead punitive, they need not be geared to
the actual damages caused, and are only limited by the parameters
of the sentencing discretion allowed for that crime. On the other
hand, a civil fine, which seeks to compensate the aggrieved party,
must bear some relationship to the damages being suffered, and for
this reason is considered remedial rather than punitive in nature.
 Conversely, civil incarceration must be tied to
corrective measures, that is, the curing of the contumacy by
compliance with the violated order. Such is the present case.
Appellant's civil detention, which turned out to last 17 months by
his choice, sought curative results, namely, compliance with the
order. By the time of his civil detention, appellant had already
independently committed the crime for which he is presently charged
and convicted; namely, criminal contempt. At that point he could
no more turn back the clock on his actions than, for example, a
robber could avoid being convicted of bank robbery by returning the
loot to a bank he had robbed. Or perhaps more on point, he is
entitled to no more success in his present contention, than if he
sought to raise a double jeopardy defense to criminal bank robbery
charges after losing a civil law suit in which the bank sought the
return of stolen money from appellant. One proceeding takes place
in a civil setting, while the other is criminal in nature.
 Simply put, the Double Jeopardy Clause prohibits
sequential criminal prosecutions or sanctions. It does not bar
simultaneous or sequential civil and criminal proceedings even if
they arise out of the same factual setting. A civil contempt
proceeding for the purpose of seeking compliance with an order of
the court, whether it brings about the imposition of coercive,
nonpunitive fines, and/or imprisonment subject to release by
purging of the contempt, is not criminal in nature, see 
Shillitani, 384 U.S. at 371, it is a civil proceeding to which
jeopardy does not attach.
 Although appellant recognizes in his brief the compelling
force of the Supreme Court's decision in Yates, 355 U.S. 66, he
argues that the holding in Yates must be tempered by the more
recent one in United States v. Ursery, 518 U.S. 267. In Yates, it
was specifically ruled that given that "[t]he civil and criminal
[contempt] sentences served distinct purposes, the one [being]
coercive, the other punitive and deterrent . . .[,] that the same
act may give rise to these distinct sanctions presents no double
jeopardy problem," 355 U.S. at 73. We are unable to find any
support for appellant's position in Ursery, or for that matter, in
any other case that we are aware of. In fact, if anything, Ursery 
lends additional support to Yates on the point at issue.
 Ursery deals with the double jeopardy effect of civil
forfeiture proceedings on parallel or subsequent criminal processes
arising out of the same operative facts leading to the civil
forfeiture. The Court's ultimate conclusion that civil forfeitures
are "neither 'punishment' nor criminal for purposes of the Double
Jeopardy Clause," 518 U.S. at 292, closely tracks the present
situation as regards civil contempt, for this is exactly what we
are ruling in this appeal. Ursery, therefore, is not of much help
to appellant's position. Cf. United States v. Bajakajian, ___ U.S.
___, 1998 WL 323512 (June 22, 1998) (reiterating that the Double
Jeopardy clause does not bar institution of civil forfeiture
actions after criminal conviction, but holding that a criminal fine
must be "proportionate" to the offense under the Excessive Fines
clause).
 The two alternative tests indicated in Ursery for
determining the civil/criminal nature of a proceeding are: (1)
whether Congress has expressed its intention in the relevant
statute as to the nature of the proceeding, or (2) even if there is
an expression in the statute that it is civil in nature, whether
there is "the clearest proof" that the resulting imposition is "so
punitive either in purpose or effect" as to require the conclusion
that the measure is punitive rather than remedial in nature. 518
U.S. at 289 n.3.
 Both of these tests militate against appellant's
position. Undoubtedly, 28 U.S.C. 1826 evinces Congress's
intention that the proceedings promoted thereunder be civil in
nature. Similarly, far from a showing that the civil incarceration
in this case presented "clear proof" of a punitive purpose or
effect, the very fact that appellant's civil imprisonment was
subject to his control and choice manifests an unmistakable
distinction from the imposition of a criminal sanction, in which
the defendant lacks any decisive control as to the duration of his
punishment. See Shillitani, 384 U.S. at 368; United States v.
Michaud, 928 F.2d 13, 15 n.1 (1st Cir. 1991).
 For the reasons stated above we reject appellant's double
jeopardy challenge.
 III. Due Process Allegations
 A. Void for vagueness arguments
 The Due Process Clause of the Fifth Amendment requires
that a criminal statute be found "unconstitutionally vague if it
'fails to give a person of ordinary intelligence fair notice that
his contemplated conduct is forbidden by [the] statute.'" UnitedStates v. Harriss, 347 U.S. 612, 617 (1954); see also United Statesv. Angiulo, 897 F.2d 1169, 1178 (1st Cir. 1990). The criminal
statute in question, 18 U.S.C. 401(3), authorizes a court "to
punish by fine or imprisonment . . . [d]isobedience or resistance
to its lawful writ, process, order, rule, decree, or command."
Because no First Amendment concerns are implicated in this appeal,
the vagueness challenge is limited by the framework of the specific
facts in the record of the case. See Village of Hoffman Estates v.
Flipeside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.7 (1982);
United States v. Bay State Ambulance and Hosp. Rental Service,
Inc., 874 F.2d 20, 32 (1st Cir. 1989); United States v. Cintolo,
818 F.2d 980, 996 (1st Cir. 1987).
 The question before us is thus whether a person of
ordinary intelligence in appellant's situation would have
understood that refusing to testify before the grand jury in the
face of a direct written and oral order of the district judge,
would constitute "disobedience or resistance" to a court's "lawful
writ, process, order, rule, decree, or command." The answer to
this question is self-evident. Both the facts of this case and the
plain language of 401(3) lead inexorably to this conclusion. 
See Robinson v. Berman, 594 F.2d 1, 2 (1st Cir. 1979). Moreover,
the statute's "application to [the] particular conduct" at issue
here -- refusal to comply with a court order to testify -- is a
notoriously known circumstance, well within the general knowledge
of the public by reason of the numerous prior criminal prosecutions
in this district, this circuit, and throughout the country. Seeid. Lastly, the "unusually high" scienter requirement that must be
met by the government in a criminal contempt prosecution, namely
that defendant "willfully" disobeyed the order, see note 1,
"mitigates any vagueness, especially with respect to the adequacy
of notice to the defendant[,] that his conduct is prescribed." Bay
State Ambulance, 874 F.2d at 33.
 Appellant nevertheless argues that the statute is unclear
because it only criminalizes violations of "lawful" orders, a
condition which he claims is difficult to identify. Appellant
makes no claim either now or previously that this particular order
is either unlawful or unclear, as well he cannot. Consequently,
his objection is outside the scope of this Court's "as-applied"
review. See Cintolo, 818 F.2d at 996. This is particularly the
case when one considers that court orders carry an initial
presumption of validity which must be subjected to challenge
through established procedures, not through unilateral
noncompliance. The limited exceptions to this rule, for example,
where a court issues an order clearly without jurisdiction over the
parties or subject matter, or that is "patently unconstitutional"
or "transparently invalid" on its face, see In the Matter of the
Providence Journal Co., 820 F.2d 1342, 1347-48 (1st Cir. 1986),
obviously do not apply to the present circumstances.
 The allegations regarding vagueness are not well taken.
 B. The Alleged Lack of Fair Warning
 In a related variation of the void-for-vagueness
argument, appellant contends that he was not given "fair warning"
that disobedience of the court order to testify exposed him to
potential criminal prosecution and punishment over and beyond the
civil sanctions alluded to in the May 7 and 20, 1993 orders. This,
he claims, constitutes a due process violation. We understand
appellant to claim that he was unaware that by committing a civil
contempt he was also engaging in a criminal one, and that there was
a duty on the part of someone, presumably the government, or
perhaps the court, to advise him of this possibility before he
could be held criminally responsible for this conduct.
 Appellant's brief is particularly scant in supporting
this novel theory. We restate the age-old principle that ignorance
of the law is not a defense to its violation. See Cheek v. United
States, 498 U.S. 192, 199 (1991). Such rare exceptions as exist to
this ancient and universal maxim, are patently inapplicable to the
present circumstances. See United States v. Anzalone, 766 F.2d
676, 678 (1st Cir. 1985); cf. Ratzlaf v. United States, 510 U.S.
135, 149 (1994) (acknowledging "the venerable principle that
ignorance of the law generally is no defense to a criminal
charge"). In particular, appellant's inherently tenuous position
is weakened even further by the fact that he was assisted by
counsel at all relevant times. The assistance of counsel, of
course, is not required but merely serves to frame appellant's
fallacious claim.
 There is nothing unique about the law of criminal
contempt that sets it outside the standard established for the
majority of the criminal law that ignorance of its strictures does
not excuse noncompliance. See United States v. Remini, 967 F.2d
754, 758 (2d Cir. 1992). There is furthermore nothing in the Due
Process Clause that requires a court to give notice that criminal
contempt charges may be brought after a witness is held in civil
contempt. See United States v. Monteleone, 804 F.2d 1004, 1008
(7th Cir. 1986); United States v. Petito, 671 F.2d 68, 73 (2d Cir.
1982). In this regard, In re Grand Jury Proceedings, Ortloff, 708
F.2d 1455, 1458 (9th Cir. 1983), relied upon by appellant, is
inapposite.
 Finally, we note that district judges may find it useful
to warn a defendant explicitly that his refusal to comply with an
order exposes him not only to civil contempt, but also to criminal
contempt. After all, giving such warnings will only increase the
likelihood that the orders will be obeyed. This practice is in no
way inconsistent with our holding in this case, which is merely
that such warnings are not required by law.
 IV. Allegation of Failure to Prove Lack of Willfulness
 Beyond a Reasonable Doubt

 Appellant contends that his motion for acquittal should
have been granted because the Government failed to prove beyond a
reasonable doubt his lack of good faith in refusing to comply with
the court's order to testify. The basis for this contention is a
motion filed by appellant's third consecutive counsel, seeking to
vacate or suspend the order of contempt.
 This motion was filed after appellant was found in
violation of the district court's order. It is grounded on the
contention that although appellant had been granted use immunity,
and thus could not validly claim a Fifth Amendment-based privilege
because he had allegedly been the subject of an illegal wiretap and
was thus an "aggrieved person" under 18 U.S.C. 2510 et seq., he
had "other valid grounds" for remaining silent pursuant to In re
Lochiatto, 497 F.2d 803, 808 (1st Cir. 1974). See also Gelbard v.
United States, 408 U.S. 41, 59 (1972).
 Appellant concedes that he failed to raise this matter
before the district judge as a defense to the issuance of the
finding of contempt and the issuance of the civil contempt order.
Appellant nevertheless claims that he had not waived this right and
could raise this issue as a defense to the criminal contempt charge
under Gelbard.
 The record in this case establishes that conversations
attributed to appellant were intercepted pursuant to court-
authorized electronic surveillance. Appellant and his then counsel
of record were informed of this matter prior to the May 20, 1993
hearing. Although entitled to receive the supporting documentation
related to this electronic surveillance, appellant never requested
it, apparently as part of a negotiated agreement with the
Government which, in exchange, allowed him to be released on his
own recognizance for two weeks after his being found in civil
contempt, rather than the usual 48 hours, which is the practice in
the District of Massachusetts. 
 The motion giving rise to the present controversy was
filed on June 3, 1993, the day before appellant was due to report
to the U.S. Marshal to commence his civil contempt detention. This
was the first time that appellant claimed entitlement to Lochiattorights. A hearing was held that same day before the judge who
issued both the immunity and civil contempt orders. After
considering the argument of counsel, the court rejected appellant's
contention that he had not made a knowing waiver of his rights as
to Lochiatto discovery, and refused to reopen or reconsider the
civil contempt order. Nevertheless, although appellant was
incarcerated, the Government produced the electronic surveillance
materials to which he would have been entitled under Lochiatto. No
challenge of any nature was ever made to the validity of the
wiretap, nor was an appeal taken from the civil contempt order or
the court's denial of the motion to vacate or suspend the same.
 Appellant next raised the Lochiatto issue at the time of
his criminal contempt trial, when he again claimed that the civil
contempt order was invalid because Lochiatto had not been complied
with. The district judge again ruled that this matter had to be
raised before the contempt order issued, and not having been timely
raised, was considered waived. Thereafter the district court ruled
that the Government had met its burden of proving that appellant
acted knowingly and willfully in disobeying its order. As part of
this finding, the court determined that good faith (or the lack
thereof) was only one factor to be weighed in determining whether
the element of willfulness beyond a reasonable doubt had been met.
 In Lochiatto, a witness before the grand jury who had
been granted use immunity refused to testify, alleging that the
inquiry of the government was the "fruit" of an illegal wiretap. 
See 497 F.2d at 805. In this case, the government admitted the
existence of electronic surveillance but asserted that all
information brought before the grand jury was the product of court-
authorized wiretaps. The district court rejected the various 
Lochiatto's defendants request for discovery of the supporting
documentation and proceeded to hold them in civil contempt. We
reversed this ruling, holding that upon a proper request, the
witness was entitled to inspect the appropriate documentation
surrounding the issuance of the wiretap, e.g., the application, the
supporting affidavits, the court order itself, and the government
affidavit indicating the length of time the surveillance was
conducted.
 The distinction between Lochiatto and the present
situation is apparent. To begin with, the Lochiattos made a timely
request for the wiretap information before the district court found
them to be in contempt. Although we will not attempt to delineate
all possible scenarios regarding waiver of rights, the present
circumstances spell out a waiver of Lochiatto rights not only
because appellant failed to request disclosure of the wiretap
information before the contempt ruling, but also because appellant
took this action as a result of a bargain with the government in
exchange for which he was allowed additional time to report for his
civil incarceration. There is no question that appellant made a
conscious choice not to contest the issue.
 A further significant difference from Lochiatto lies in
the action taken by the Lochiattos upon their being found in
contempt of the court's order. They did not sit back in defiance,
but instead followed orderly procedure, appealed, and were thus
able to reverse the ruling because they had saved their rights. In
the present case not only did appellant fail to do the latter, but,
even after receiving the discovery to which he would have been
entitled, he did nothing except sit in jail in contumacious
resistance. He did not in any legal manner challenge the
lawfulness of the order by seeking its revocation on appeal. He
waited until criminal charges were brought and then attempted to
collaterally question the legitimacy of the civil contempt finding,
on grounds already rejected in that prior proceeding. Nothing in
Lochiatto or any other case that we are aware of supports his
position.
 We should further add that appellant cites no cases in
support of his contention that proof of the absence of a good faith
basis for refusing to comply with a court order is a separate
element of criminal contempt. In fact the cases are to the
contrary. See, e.g., Remini, 967 F.2d at 757-58 (Good faith
misunderstanding of the law, including good faith reliance on the
advice of counsel, is not a defense to a criminal contempt charge);
Michaud, 928 F.2d at 15; United States v. Underwood, 880 F.2d 612,
618 (1st Cir. 1989); United States v. Armstrong, 781 F.2d 700, 706
(9th Cir. 1986); United States v. Rylander, 714 F.2d 996, 1003 (9th
Cir. 1983). Additionally, the evidence in the record, when viewed
in the light most favorable to the verdict, see United States v.
Akinola, 985 F.2d 1105, 1109 (1st Cir. 1993), amply supports the
finding that appellant's refusal to comply with the May 7, 1993
order to testify before the grand jury was not only willful, but
clearly without any good-faith basis.
 Appellant's motion for acquittal was properly denied.
 V. The Application of the Proper Sentencing Guideline
 Appellant was convicted of criminal contempt under 18
U.S.C. 401. There is no specific sentence mandated for this
offense. The applicable Guideline for this offense is provided by 
 2J1.1, which directs that 2X5.1 be used. That section in turn
directs the use of the guideline for the most analogous offense. 
The district court concluded that the obstruction of justice
guideline, 2J1.2, is the most analogous. Appellant disagrees and
espouses 2J1.5, which deals with non-appearing material
witnesses, as being the applicable provision. 
 The first issue Marquardo appears to raise is whether
U.S.S.G. 2X5.1, which requires the court to apply the guideline
for 'the most analogous offense,' excludes, in a case of criminal
contempt for refusal to testify before a grand jury, a district
court from turning to 2J1.2 (obstruction of justice) as the most
apt analogue. To state the proposition is to reveal its frivolity. 
The question of the most appropriate analogy is essentially a
question of fact, at most a mixed question of law and fact, and we
give deference to the district court's factual determinations. SeeUnited States v. Phath, 1998 WL 244746, at *3 (1st Cir. May 20,
1998).
 The evidence submitted to the trial court was to the
effect that appellant was a bookmaker who was privy to evidence of
the extortion activities of members of the so-called Winter Hill
Gang. This gang and its members were under investigation by the
federal grand jury before whom appellant ultimately refused to
testify regarding these extortion activities. The district court
found that:
 [t]his is not like a case involving
 failure of a witness to comply with a
 subpoena to testify at trial. The refusal
 of this defendant to answer a grand jury
 inquiry to him about his knowledge of the
 Winter Hill Gang interfered with grand
 jury proceedings bearing upon organized
 crime activities of large scope.

 Based on the record in this case we can perceive no error
in this conclusion, much less clear error. We might add that
although this is a matter of first impression in this circuit,
other courts of appeal have upheld the application of 2J1.2 to
criminal contempt convictions on similar findings. See, e.g., 
United States v. Voss, 82 F.3d 1521, 1541 (10th Cir. 1996).
 Appellant's reliance on Underwood, 880 F.2d at 620, is
misplaced, for in suggesting in that case that 2J1.5 was more
closely analogous to that defendant's conduct, the Underwood panel
observed that the defendant "did not intend to obstruct justice"
but was afraid that the his testimony would be used against him in
a pending case of his own before the same district judge. As
subsequent courts have concluded, the facts in Underwood made it "a
special case." Remini, 967 F.2d at 760. We reiterate that the
question of which is the most appropriate analogy depends on the
facts of the case. It follows that, in some cases, criminal
contempt findings might not be covered by 2J1.2 as "obstruction
of justice" conduct. On occasion, a district judge may find
another analogy more apt to the facts in the case at bar, and, if
so, the choice will be reviewed for clear error.
 Here, however, the district court found that "[Appellant]
knew that his refusal to answer a question of the grand jury about
his association with the Winter Hill Gang . . . would have an
adverse effect upon and would obstruct the grand jury proceedings." 
Nothing further is required considering the standard of deference
that is due to a district court's decisions in a criminal contempt
setting, in which the trial judge is uniquely in a position to
assess the circumstances of defendant's actions. See Voss, 82 F.3d
at 1531.
 We have considered all other issues raised by appellant
and find them lacking in merit.
 Appellant's appeal is dismissed and his conviction is
affirmed.